Stanley S. SMILAN, Plaintiff,

v.

UNITED AIRLINES, INC., Defendant.

No. CV 91–4473.

United States District Court,
E.D. New York.

June 29, 1992.

Catalano & Sparber by Douglas P. Catalano, New York City, for plaintiff.

O'Melveny & Myers by Jeffrey I. Kohn, New York City, for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

In the above-referenced case, Stanley S. Smilan ("plaintiff" or "Smilan") has brought suit against United Airlines, Inc. ("defendant" or "United") for alleged violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). In his first cause of action, Smilan claims that, in violation of the ADEA, United improperly denied him a paid relocation to Seattle. In his second cause of action, he contends that United, also in violation of the ADEA, improperly paid him for his accrued sick time and vacation time at a Second Officer's pay rate immediately after he reached age sixty, the mandatory retirement age for pilots.

On January 6, 1992, United moved to dismiss the complaint on various grounds pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. On March 25, 1992, this Court notified the parties that pursuant to Rule 12(b), it was converting United's motion to dismiss to a motion for summary judgment under Rule 56. For the reasons stated below, defendant's motion for summary judgment is denied as to plaintiff's first claim and granted as to his second.

## I. BACKGROUND

Section 121.38(c) of the Federal Aviation Administration ("FAA") regulations (the "age sixty rule") prohibits commercial flights seating more than thirty passengers from taking off under the command of a pilot sixty years or older. 14 C.F.R. § 121.-383(c) (1991); *see Aman v. Federal Aviation Admin.*, 856 F.2d 946, 948 (7th Cir. 1988). Captains and First Officers of commercial aircraft are therefore required to step down from their positions upon reaching the age of sixty.

The age sixty rule allows the former Captains or First Officers to continue working for the airlines, but in order to remain in the cockpit, they must accept a demotion to a position of lesser authority, such as that of a flight engineer or Second Officer. *Id.* United follows this FAA policy by allowing Captains who have reached the age of sixty to obtain Second Officer status and remain in that position for as long as they can meet the minimum physical requirements.

From 1969 until November 1990, Smilan was employed by United as a Captain of various types of aircraft. In the latter part of 1988, when he was a Captain of a DC–10 and was domiciled in New York, he applied for a vacancy as Captain of a 747–100 based in San Francisco. Smilan's application was accepted and, after completing the required training, he was activated to the new position on February 14, 1989. At that time he was fifty-eight years old.

Pursuant to Section 10 of the 1985 Collective Bargaining Agreement (the "Agreement") between United and the Air Line Pilots Association ("ALPA"), upon a pilot's activation to a new position, he became entitled to a company-paid move to a new domicile, so long as the move was made within two years of the date he was activated. Although Smilan was to be domiciled in San Francisco, he decided to relocate to Seattle.[1]

From the latter part of 1989 until approximately May 1990, Smilan and his wife made a number of trips to Seattle to search for a house. During that period, United suggested to Smilan that he might not be entitled to move to Seattle because of Section 10–C–5 of the Agreement which provides:

> Should a pilot be awarded an assignment with an advertised effective date within two (2) years of his normal retirement, he shall be entitled to use the associated paid move entitlement to move *only to the geographic area of his new domicile.*[2] (emphasis added).

By a letter dated November 9, 1989, Captain Ed Daley ("Daley"), United's Chief

---

1. Seattle is only a ninety minute flight from San Francisco, and it was a common practice for pilots to "commute" such distances using a pilot's pass privileges.

2. United defines the geographic area of a pilot's domicile as the area within ninety miles of the airport at which the pilot is based.

Pilot in charge of its San Francisco based flight operations, wrote to Smilan to apprise him that he soon had to inform United of his plans to retire or to continue working after his sixtieth birthday pursuant to

> paragraph 5 of the Age 60 Letter of Agreement which states, "One (1) year prior to age 60, all active pilots shall be required to sign a statement of intent to inform the company of his retirement or non-retirement plan upon reaching the normal retirement age." You will be reaching age 59 soon, and, therefore, will have to inform us *prior to your 59th birthday,* of your retirement intentions at age 60....
>
> It is necessary for us to know your intentions for purposes of manpower and vacation planning....

However, when Smilan subsequently inquired from Daley as to the definition of "normal retirement" in reference to paid relocations, Daley responded by letter dated March 14, 1990 as follows:

> I checked with EXO regarding your inquiry as to the definition of "normal retirement" as it applies to the paid move provisions of the Agreement. Jerry Andrews—EXOER says that age 60 retirement is considered normal for pilots regardless of intent to stay on past age 60 as a Second Officer.

Smilan contends that it was only through this letter that he was definitively informed that he would not be eligible for a paid relocation to Seattle. He further contends that United's policy of restricting the company paid moves of pilots between the ages of fifty-eight and sixty was a discriminatory practice in violation of 29 U.S.C. § 623.

On January 11, 1988, Smilan brought a grievance against United based on United's allegedly improper release, to the FAA, of information contained in his medical file.[3] As part of the relief requested, Smilan sought a company-paid move to a domicile

of his choice. On July 11, 1990, the case was settled for $17,000 in full satisfaction of "all claims arising out of the events which led to the filing of the above-referenced grievances." Settlement Agreement between Smilan and United dated July 11, 1992, attached to Defendant's Motion to Dismiss as Exh. B to Pappalardo Affidavit.

Carla Pappalardo ("Pappalardo"), who represented United on that case as the Senior Staff Representative for arbitration from United's Employee Relations Department, has submitted an affidavit in which she states that the $17,000 settlement was based on the average cost incurred by United for a paid relocation of a pilot from New York to Seattle. Smilan, however, contends that the settlement was not based on the cost of a paid relocation, but was intended to compensate him for the $12,000 in legal fees he had incurred plus $5,000 for his pain and suffering.

On November 16, 1990, Smilan turned sixty and could no longer serve as an airline Captain. Pursuant to United's policy, he elected to continue his employment as a Second Officer and began the necessary training on November 25, 1990. Smilan alleges that he was unable to complete his training at that time due to the emotional distress caused by United's discriminatory practices. Instead, between December 12, 1990, and December 26, 1991, Smilan exhausted all of his accrued sick leave and vacation time.[4]

If Smilan had retired at the age of sixty, United would have paid him for his accrued vacation time at a Captain's pay scale but it would not have paid him for any of his approximately ten months of accrued sick leave. However, because Smilan chose to continue in United's employ as a Second Officer, United paid him for the accrued sick leave and vacation days at a Second Officer's pay scale, which is only sixty percent of a Captain's rate.[5]

---

**3.** This information was released by United in April 1984 in response to a subpoena.

**4.** Smilan resumed the training program on December 26, 1991 and completed it on March 15, 1992.

**5.** Pursuant to the Agreement, when pilots actually use their accrued sick time and vacation time they are paid for such time at the rate of their then-current position, regardless of their position and rate of pay when they were accruing such time.

Smilan notes that United does not change the rate at which it pays its younger pilots for accrued sick leave and vacation time until they are activated or complete their training for the new positions. Nevertheless, United reduced Smilan's pay on the first day of the month following his sixtieth birthday, rather than waiting until he was activated as a Second Officer or completed the appropriate training. This too, plaintiff contends, is in violation of the ADEA.

On December 27, 1990, Smilan filed a charge of age discrimination with the New York State Division of Human Rights ("NYSDHR") against both ALPA and United in regard to his charge that United improperly denied him a paid relocation. NYSDHR forwarded the charge to the Equal Employment Opportunity Commission ("EEOC") for dual filing. On November 14, 1991, Smilan filed a second charge of age discrimination with the EEOC in regard to his claim that United improperly paid him for his accrued sick leave and vacation time at the pay rate of a Second Officer.

## II. DISCUSSION

A. *Denial of a Paid Relocation to Seattle*

1. *Statute of Limitations*

A prerequisite for filing a federal civil action under the ADEA based on an allegedly discriminatory act which occurred in a state, like New York, that has a law prohibiting age discrimination, is the filing of a charge of unlawful discrimination with the EEOC within 300 days after the alleged unlawful act occurred. *See* 29 U.S.C. §§ 626(d)(2), 633(b); *Bennett v. New York City Dep't of Corrections*, 705 F.Supp. 979, 982 (S.D.N.Y.1989). The purpose of this limitations period is to guarantee the protections of the civil rights laws to those who promptly assert their rights while protecting employers from the burden of defending claims that arose from employment decisions that are long past. *Delaware State College v. Ricks*, 449 U.S. 250, 256, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980).

Failure to satisfy the 300 day filing requirement will lead to a dismissal of the claim. *Economu v. Borg–Warner*, 829 F.2d 311, 315 (2d Cir.1987); *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 23 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985).

The limitations period commences at the time the alleged discrimination decision is made and communicated to the plaintiff. *Ricks*, 449 U.S. at 258, 101 S.Ct. at 504; *Economu*, 829 F.2d at 315 ("We must look, therefore, to the date on which defendants 'had established [their] official position—and made that position apparent to [plaintiff]' ") (quoting *Ricks*, 449 U.S. at 262, 101 S.Ct. at 506). Therefore, it must be determined when Smilan knew or had reason to know that United was going to deny him a paid relocation pursuant to section 10–C–5 of the agreement. *See Allen v. United States Steel Corp.*, 665 F.2d 689, 692 (5th Cir.1982) ("limitations period begins to run from the time that the complainant knows or reasonably should know that the challenged act has occurred"); *see also Pauk v. Bd. of Trustees of City Univ. of N.Y.*, 654 F.2d 856, 859 (2d Cir.1981) ("the federal claim accrues when the plaintiff 'knows or has reason to know' of the injury that is the basis of his action"), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982).

Smilan filed his first charge with the EEOC on December 27, 1990. Defendant contends that prior to March 2, 1990, 300 days before he filed his EEOC charge, Smilan knew or should have known about its allegedly discriminatory practice of denying pilots who are fifty-eight years old a paid relocation more than ninety miles from their new domiciles. Therefore, defendant contends, Smilan's first claim is time-barred.

First, defendant argues that plaintiff should be charged with knowledge of section 10–C–5 of the Agreement as of 1985, the year in which the Agreement became effective. Defendant relies on *Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900,

109 S.Ct. 2261, 104 L.Ed.2d 961 (1989),[6] a Title VII case in which the Supreme Court held that the cause of action on a challenge to a bargained for seniority system claimed to have disparate impact on women accrued at the time the collective bargaining agreement went into effect, not the time that the plaintiffs were affected by its terms.

> With a facially neutral system the discriminatory act occurs *only* at the time of adoption, for each application is nondiscriminatory (seniority accrues for men and women on an identical basis). But a facially discriminatory system (e.g., one that assigns men twice the seniority that women receive for the same amount of time served) by definition discriminates each time it is applied.

*Lorance,* 490 U.S. at 912 n. 5, 109 S.Ct. at 2269 n. 5. Therefore, when a contract provision is facially neutral, the statute of limitations is triggered at the time of the provision's adoption, *id.* at 911, 109 S.Ct. at 2268–69, but when a contract provision is discriminatory on its face, it can be challenged any time it is applied. *Id.* at 912, 109 S.Ct. at 2269.

In the instant case, Section 10–C–5 sets different standards for pilots over age fifty-eight than it sets for younger pilots. This Court finds that this section is discriminatory on its face and therefore the plaintiff is entitled to challenge the provision at the time it was applied to him. Therefore, the 300 day time period commenced when Smilan knew or should have known that United was going to apply the provisions of section 10–C–5 to him. *Ricks,* 449 U.S. at 258, 101 S.Ct. at 504; *Allen,* 665 F.2d at 692; *Pauk,* 654 F.2d at 839.

■ United contends that plaintiff was notified about the possible application of section 10–C–5 to him in late 1989 and, therefore, the statute of limitations accrued as of that date. United notes that in paragraph 11 of the complaint, plaintiff states that towards the end of 1989, United first suggested that pursuant to Section 10–C–5 of the Agreement, Smilan might not be

permitted a company paid relocation to Seattle. Moreover, Daley's letter to Smilan dated November 9, 1989, discusses Smilan's approaching "normal retirement" date.

However, the term "normal retirement" in the November 9, 1989 letter does not specifically refer either to Section 10–C–5 or to a denial of paid relocations. If this letter was the sole source of United's "suggestion" to Smilan that he might not be entitled to the company paid relocation here at issue, it does not appear to be a sufficiently definite notice to commence the 300 day statutory period. Moreover, in view of the fact that Daley's March 14, 1990 letter to Smilan indicates that Daley had to check with his superiors regarding the interpretation of the term "normal retirement" in the context of paid relocations for pilots who planned to work as Second Officers after age sixty, it is at least possible that United did not provide Smilan sufficient indication prior to that letter regarding his rights (or lack of rights) under section 10–C–5 of the Agreement. Consequently, this Court finds that at this time there is a genuine issue of fact as to when plaintiff knew, or should have known, that United was going to deny him a company paid relocation to Seattle.

*2. Effect of Settlement in Earlier Grievance by Plaintiff*

■ Defendant states that on July 11, 1990 Smilan received $17,000 as a settlement of a grievance he had brought in 1988 based on United's allegedly improper release in April 1984 of information contained in Smilan's medical file. As part of the relief requested, Smilan had sought a company-paid move to a domicile of his choice and Pappalardo has submitted an affidavit in which she states that the $17,000 settlement was based on the average cost incurred by United for a paid relocation from New York to Seattle. Therefore, defendant now asks that plaintiff's first cause of action be dismissed because the relief he requests—a company-paid relocation—has

**6.** Plaintiff argues that the Civil Rights Act of 1991 overrules *Lorance.* To the extent that the Civil Rights Act of 1991 is applicable to the facts

of this case, the Court holds that its provisions are to be given only prospective effect.

already been received by virtue of the settlement of the 1988 grievance.

Smilan first notes that the 1988 action was filed in 1988, before he had any interest in a Seattle domicile. Furthermore, he insists that he was never told that the 1988 settlement was based on the cost of a company-paid relocation. To the contrary, he claims that he accepted the $17,000 in full satisfaction of "all claims arising out of the events which led to the filing of the [grievances in that case]" because he had already spent $12,000 in litigation costs and he was advised by his ALPA attorney that the case would be worth less than $17,000 if it went to arbitration.

Under these facts, and making all inferences in favor of the non-moving party, *Shockley v. Vermont State Colleges*, 793 F.2d 478, 481 (2d Cir.1986), this Court finds that United has not established that Smilan has already received the company-paid relocation he claims was improperly denied to him as a result of his being activated, in February 1989, to Captain of a 747–100 domiciled in San Francisco. Accordingly, United's motion for summary judgment is denied as to Smilan's first claim.

### B. *Reduction of Smilan's Pay for Accrued Sick Leave and Vacation*

#### 1. *Timeliness of Plaintiff's Second Claim*

Defendant first notes that a plaintiff is required to wait sixty days after filing a claim with the EEOC before bringing a federal claim. *See* 29 U.S.C. § 626(d) ("No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission"). On November 14, 1991, Smilan filed his EEOC claim alleging that United improperly reduced his pay for accrued sick leave and vacation time to a Second Officer's rate before he completed his training for that position. On the same day, plaintiff filed the instant suit in federal court.

Although plaintiff makes no attempt to explain his failure to comply with the sixty day waiting period, he notes that in *Dales-sandro v. Monk*, 864 F.2d 6, 9 (2d Cir.1988), the Second Circuit held that when a plaintiff fails to abide by the sixty day rule, a district court should merely stay the action until the sixty day period expires rather than dismiss the claim. For the reasons that follow, such a stay will not be needed.

#### 2. *Statute of Limitations*

■ United contends that Smilan's second claim, like his first, is time-barred. Again relying on *Lorance*, United argues that Smilan should be charged with knowledge of the relevant contract provisions when the Agreement went into effect in 1985. As to this claim, United may indeed be correct.

In any event, plaintiff agrees that he was aware of defendant's allegedly discriminatory act by January 2, 1991, when he received his first paycheck at a Second Officer's pay rate. Because Smilan failed to file his EEOC action until November 14, 1991, more than 300 days after that act, defendant argues that the claim is time-barred. Plaintiff counters that each paycheck issued by United to Smilan for his accrued sick leave and vacation time at a Second Officer's pay rate was a new and continuing violation of his rights and therefore the statute of limitations accrues anew each time such a paycheck was issued.

■ The concept of "a continuing violation ... applies to a continuously maintained discriminatory employment policy." *Bradley v. Consolidated Edison Co. of New York, Inc.*, 657 F.Supp. 197, 204 (S.D.N.Y.1987). However, it may not be based on the continuing effects of an earlier discrimination. *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1414 (S.D.N.Y.1989) (citing *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)). Although courts in the Second Circuit look unfavorably on the concept, *Blesedell*, 708 F.Supp. at 1414–15, a continuing violation will be found if the ongoing plan or policy is facially discriminatory. *O'Malley v. GTE Service Corp.*, 758 F.2d 818, 821 (2d Cir.1985).

The key to resolving defendant's motion is to determine whether United's policy of changing rates of pay was facially discriminatory or facially neutral. This Court finds that it is facially neutral. Although United pilots who reached the age of sixty were not paid at a Captain's salary during the time they were training to be Second Officers, this policy is consistent with the FAA age sixty rule which does not allow pilots to be Captains beyond that age. On the other hand, when younger United pilots applied for advanced positions (or lower positions), there was no reason to change their pay rate until they completed their training or received an assignment because they may never have done so. *See Hendrix v. City of Yazoo City, Miss.*, 911 F.2d 1102, 1103 (5th Cir.1990) (paychecks issued pursuant to a facially age neutral policy are a continuing effect rather than a continuing violation). Furthermore, the Court notes that the EEOC has recently issued an opinion on United's salary policy here in issue which holds that policy was facially neutral and lawful.[7]

Because plaintiff's second claim is based on a facially neutral policy, no continuing violation exists. Therefore, plaintiff's second claim is time-barred because Smilan was clearly aware of the allegedly discriminatory act by January 2, 1991, more than 300 days prior to his filing of this claim with the EEOC.

### III. CONCLUSION

Accordingly, for the foregoing reasons, defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is denied as to plaintiff's first cause of action and granted as to plaintiff's second cause of action.

The parties are hereby directed to go forward with full discovery. If, through

discovery, it is found that prior to March 2, 1990, plaintiff clearly knew or should have known that United was going to deny him a paid relocation to Seattle pursuant to section 10–C–5 of the Agreement, United may then refile its motion for summary judgment.

SO ORDERED.

---

**7.** On March 16, 1992 the EEOC issued a determination in the matter of *Stanley Smilan v. United Airlines,* Charge No. 160–92–0356. Although this Court is not obligated to follow the EEOC decision, its findings may be admitted as evidence in a federal proceeding. *Astoria Federal Sav. and Loan Ass'n v. Solimino,* — U.S. —, 111 S.Ct. 2166, 2173, 115 L.Ed.2d 96 (1991); *see Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39,

96 S.Ct. 1949, 1961 n. 39, 48 L.Ed.2d 416 (1975) (as a result of prior administrative proceedings, "many potential issues can be eliminated by stipulation or in the course of pretrial proceedings in the District Court"). In the instant case, this Court finds the reasoning of the EEOC determination persuasive in regard to the resolution of plaintiff's second claim.