**Juanito ONGSIAKO, Plaintiff,**

v.

**CITY OF NEW YORK and NYC Dept. of Env. Protection, Defendants.**

No. 99 CIV. 5972(JES).

United States District Court, S.D. New York.

May 7, 2002.

Ballon Stoll Bader & Nadler (Marshall B. Bellovin, Esq., Reena Blinkoff, Esq., Of Counsel), New York City, for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York (Bryan Glass, Assistant Corporation Counsel, Of Counsel), New York City, for City of New York.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Juanito Ongsiako ("plaintiff") brings the above-captioned action against the City of New York ("the City") and the City's Department of Environmental Protection ("the DEP") (collectively "defendants"). Plaintiff's complaint alleges that defendants impermissibly discriminated against him because of his national origin and alleged disability and that they constructively discharged him from his job as a City construction laborer. Following the completion of discovery, defendants moved for summary judgment against plaintiff on

all of his claims.[1] For the reasons set forth below, the Court grants defendants' motion.

## I. BACKGROUND

Plaintiff began working as a construction laborer for the City in April of 1993. *See* Declaration of Bryan D. Glass dated October 12, 2000 ("Glass Declaration"), Exhibit ("Exh.") A, Deposition of Juanito Ongsiako taken September 25, 2000 ("Ongsiako Depo.") at 73, 77. The job description for a City construction laborer indicates that employees in that category "us[e] a wide variety of heavy-duty, motor-powered equipment [to] perform[ ] work in construction, repair and maintenance of water supply distribution systems, drainage and sewer systems, buildings and plants." Glass Declaration, Exh. E., Construction Laborer Job Description ("Job Description"). Among the examples of "typical tasks" listed in this Job Description are: "[l]oads and unloads equipment," "[e]xcavates and refills in the performance of work [described] herein," and "[r]epairs broken water mains and leaking water services." *Id.*

Construction laborers perform these tasks at a number of different "yards" throughout the City; each yard performs a different function. The City assigned plaintiff to a variety of different yards between April, 1993 and April, 1994, when it sent him to the Manhattan Repair, Pike Street Yard ("Pike Street"). Plaintiff understood that he generally did not have any choice with respect to his yard assignment. *See* Ongsiako Depo. at 82. Plaintiff continued to work at Pike Street until June 1996, when he injured his back on the job. *See* Glass Declaration, Exh. L., Letters from Plaintiff's Doctor Re: June 1996 back injury. In February 1997, after returning to Pike Street following a leave of absence, plaintiff requested and was granted a transfer to the Leak Detection yard— even though he did not have the level of seniority normally required for such an assignment. *See* Ongsiako Depo. at 94–95, 98–100. Plaintiff viewed Leak Detection as a yard that required less physical exertion than Pike Street. *See id.* at 98–100. In August, 1997 plaintiff again requested and was granted a transfer to the Construction Services yard—an assignment which he perceived as even less physically demanding than Leak Detection. *See id.* at 110–12.

While at Construction Services, defendants allege that plaintiff had an "uncooperative attitude" and that he performed substandard work, as evidenced by plaintiff's supposed responsibility for breaking a plate glass window sometime in January 1998. *See* Glass Declaration, Exh. B., Declaration of Kenneth Carchietta dated October 12, 2000 ("Carchietta Declaration") at ¶¶ 6–7; Ongsiako Depo. at 166–68. Defendants contend that as a result of these problems, Mr. Carchietta requested plaintiff be transferred out of Construction Services and back to a yard within the Bureau of Water and Sewer Operations. *See* Carchietta Declaration at ¶ 9. Defendants subsequently assigned plaintiff back to the Pike Street yard effective February 2, 1998; plaintiff was informed of this transfer in late January 1998. *See* Ongsiako Depo. at 148; Glass Declaration, Exh. O, January 21, 1998 Memorandum confirming Plaintiff's Transfer to Bureau of Water and Sewer Operations.

---

**1.** The parties initial motion submissions were argued to the Court in January, 2001. Shortly thereafter, the Court granted plaintiff leave to amend his complaint to add a claim of constructive discharge. Following supplemental submissions and discovery on plaintiff's constructive discharge allegations, the parties argued that claim only to the Court on October 1, 2001. The instant memorandum opinion and order addresses all of plaintiff's claims and disposes of the above-captioned action in its entirety.

Plaintiff disputes defendants' characterization of his tenure at Construction Services. Moreover, plaintiff alleges that while he worked there his fellow construction laborers called him derogatory ethnic names based on his Filipino heritage. *See* Ongsiako Depo. at 223–35. It is not clear whether plaintiff's boss at that yard, Kenneth Carchietta, or any of Mr. Carchietta's superiors had any knowledge of these allegations prior to February 1998. The record is also unclear regarding whether, at the time of plaintiff's transfer back to the Pike Street yard, Mr. Carchietta or anyone else at the Construction Services yard was aware of the alleged work restrictions that resulted from plaintiff's 1996 back injury.

Immediately after the effective date of his transfer, plaintiff filed a complaint with the EEOC and sent a series of letters to defendants. *See* Amended Complaint dated April 23, 2001 ("Complaint"), Exh. 1, Plaintiff's February 2, 1998 EEOC complaint ("EEOC Complaint I"); Affirmation of Marshall B. Bellovin dated November 16, 2000 ("Bellovin Affirmation"), Exhs. 4–6, 8–9. In these documents plaintiff requested a rotating light duty assignment as an accommodation for his alleged disability. Plaintiff also accused defendants of discrimination on the basis of both his claimed disability and his Filipino heritage. *See, e.g.,* EEOC Complaint I; Bellovin Affirmation, Exh. 7, June 22, 2002 Letter from Plaintiff to EEOC. Plaintiff also took,

with defendants' approval, a psychiatric leave of absence from the DEP shortly after the effective date of his transfer back to Pike Street. Upon returning to work in June 1998, plaintiff worked at the Pike Street yard until September 1998, when he suffered a head injury; he subsequently took a leave of absence from which he has not returned.[2]

Plaintiff initiated the instant action on July 27, 1999. Plaintiff's complaint, in its current amended form, charges that defendants: (1) failed to accommodate his disability as required under the Americans with Disabilities Act ("ADA"); (2) discriminated against him because of his Filipino heritage by treating him less favorably than similarly situated Caucasian employees and by failing to correct a racially hostile work environment; (3) constructively discharged him[3]; (4) retaliated against him in violation of Title VII; and (5) violated various New York State anti-discrimination laws. Defendants respond that plaintiff's impairment—assuming he has one at all—does not qualify as a disability under the ADA, that plaintiff has failed to make out a *prima facie* case of national origin discrimination, or retaliation, and that the record does not contain sufficient evidence to support plaintiff's constructive discharge allegations.

## II. DISCUSSION

A court may grant summary judgment only if it determines that there are no

---

**2.** During this leave of absence—but before he expressed his intention not to return to work for defendants—plaintiff filed a second EEOC complaint in which he asserted that defendants decision to transfer him back to Pike Street in February 1998 constituted a "retaliatory scheme to oust [him] from [his] job." Glass Declaration, Exh. Y, Plaintiff's January 12, 1999 EEOC complaint ("EEOC Complaint II").

**3.** Although plaintiff's complaint lists constructive discharge as an independent claim, the

nature of plaintiff's allegations imply that he is alleging constructive discharge as a part of his disability and national origin discrimination causes of action. That is, plaintiff seems to charge that defendants took adverse employment action, and thereby violated Title VII and the ADA, by constructively discharging him. Nevertheless, for the reasons set forth below, the Court finds that plaintiff's constructive discharge claim fails no matter how it is characterized.

genuine issues of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file and affidavits. *See* Fed. R. Civ. Pr. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When ruling on a summary judgment motion, a court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no genuine issue as to any material fact exists, the moving party is entitled to summary judgment as a matter of law. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

*A. Plaintiff's Disability Discrimination Claim*

■ A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a *prima facie* case. *See Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998). In order to establish a *prima facie* case of disability discriminatory, a plaintiff must show that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he has suffered an adverse employment action because of his disability. *See Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001); *Ryan,* 135 F.3d at 869–70. Plaintiff has failed to meet this burden because he has not demonstrated that he suffers from a disability within the meaning of the ADA, that he can perform the essential functions of a City construction laborer, or that defendants took adverse employment action against him.

■ The ADA defines the term disability as "(1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; or (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In the instant case, plaintiff claims he meets the first definition of disability because he allegedly is substantially limited in the major life activity of working. The Court disagrees.

■ As the United States Court of Appeals for the Second Circuit ("the Second Circuit") recently noted, " '[t]o be substantially limited in the major life activity of working ..., one must be precluded from more than one type of job, a specialized job, or a particular job of choice' " *Giordano,* 274 F.3d at 748 (quoting *Sutton v. United Air Lines,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)) (alteration in original). Along these lines, the Supreme Court—assuming without deciding that working in fact qualifies as a major-life activity under the ADA—declared:

> "[i]f jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs."

*Sutton,* 527 U.S. at 492, 119 S.Ct. 2139. In the instant case, construing the evidence in the light most favorable to plaintiff leads to only one rational inference: plaintiff's back impairment—assuming *arguendo* that it is as severe as plaintiff contends—prevented him only from working as a City construction laborer or in other jobs for which heavy lifting was an essential function. In short, plaintiff presents no evidence from which a rational juror could infer that his impairment precluded him

from performing a "broad class of jobs." *Cf. Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 692–93, 151 L.Ed.2d 615 (2002). Indeed, in a March 3, 1998 letter plaintiff's own doctor conceded that plaintiff could perform "all clerical duties, all operations of motor vehicles [and] use . . . power tools (except jack hammer)" but warned that plaintiff should "avoid lifting objects of greater than 40 pounds." Glass Declaration, Exh. R. Such restrictions do not constitute a substantial limitation on the major life activity of working. *See, e.g., Beason v. United Techs. Corp.*, No. 97 CV 2654, 2002 WL 519459, at *7–11, —— F.Supp.2d ——, ——–—— (D.Conn. Mar.15, 2002). Because plaintiff is not substantially limited in his ability to work, and because he neither alleges nor presents evidence suggesting that defendants regarded him as being so limited or that he had a record of such a limitation, the Court finds that plaintiff is not disabled under the ADA. Accordingly, his claim of disability must be rejected.

■ Yet even if plaintiff somehow were disabled under the ADA, his disability discrimination claims still must be dismissed because he is not a "qualified individual with a disability." Plaintiff fails to meet this necessary element of his ADA claim because he is unable to "perform the essential functions of his job" either with or without accommodation. 42 U.S.C. 12111(8) (1994); *see D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir.1998). In other words, plaintiff is a "qualified individual with a disability" if he can "meet all of a [position's] requirements in spite of his handicap." *D'Amico*, 132 F.3d at 151

(internal quotations omitted) (alteration in original). In addressing this element of an ADA claim, "[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Id.*

Defendants here claim heavy lifting is an essential function of plaintiff's job. With these considerations in mind, the Court finds that the evidence in the instant case leads, once again, to only one rational inference: plaintiff was not able to perform the essential functions of his job as a construction laborer either with or without accommodation. This is especially true since plaintiff claims to be incapable of doing heavy lifting—something that both common sense and the evidence of this case shows is essential to a job whose "typical tasks" include excavation, the loading and unloading of equipment, and the removal of drainage pipes. *See* Glass Declaration, Exh. E., Job Description. Plaintiff's requested accommodation, a permanent light duty assignment[4], would eliminate one of the essential functions of his job. Accordingly, the Court finds plaintiff is not a qualified person with a disability and thus cannot maintain his ADA claim.

■ Additionally, even if plaintiff could somehow show that he is a "qualified individual" under the ADA, his claim still fails since defendants took no adverse employment action against him. While there is no bright-line rule as to what constitutes an adverse employment action, the Second Circuit emphasizes that " 'not every unpleasant matter short of [discharge or demotion] creates a cause of action.' " *Wa-*

4. Plaintiff's contention that other, Caucasian employees, received the accommodation he requested, is belied by the undisputed evidence of this case. The only example cited is that of a person who apparently injured his leg, and who—by defendants own admission—was thereafter granted a *temporary* light duty assignment; that very same employee eventually returned to his full duties. By contrast, plaintiff wants to be able to return to work as a construction laborer and permanently avoid all of the heavy lifting his co-workers are charged with doing as a basic part of their jobs.

*namaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) (quoting *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.1994)) (alteration in original); *accord Richardson v. New York State Dept. of Correctional Serv.,* 180 F.3d 426, 446 (2d Cir.1999). Rather, a plaintiff "suffer[s] an 'adverse employment action' if [he] endures a 'materially adverse change in the terms and conditions of employment.'" *Richardson,* 180 F.3d at 446 (quoting *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.1997)). Plaintiff suffered no such materially adverse change in the terms and conditions of his employment. He was simply required to perform the functions necessary for his job.

■ Plaintiff contends that the transfer to Pike Street constituted an adverse employment action because defendants knew about his bad back and nevertheless sent him to a yard that required heavy lifting. Defendants could have—and, on a number of occasions before plaintiff hurt his back, in fact did—transfer plaintiff to any yard where they believed he was needed. Plaintiff conceded as much in his deposition testimony. When asked whether defendants gave plaintiff "any choice of where [he] would be located," plaintiff answered "no." Ongsiako Depo. at 82. In sum, the transfer requests had to be approved by defendants first.

Moreover, plaintiff was never demoted and his pay was never cut. *See id.* at 90–91, 106. Thus, even assuming defendants knew of plaintiff's back restrictions at the time of his transfer in February 1998—something defendants vehemently deny—there is still no evidence from which a rational juror could conclude that defendants took adverse employment against plaintiff because of his disability. Put another way, transfers of the sort plaintiff's challenges here are a routine part of the job of construction laborer and thus plaintiff's transfer does not and cannot consti-

tute a materially adverse change in the terms or conditions of his employment.

■ Furthermore, to the extent plaintiff contends that the adverse employment action taken against him was a constructive discharge, that conclusion is completely unsupported by the record. An employee is constructively discharged when his employer "deliberately [makes] his working conditions so intolerable that he [is] forced into an involuntary resignation." *Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 161 (2d Cir.1998) (quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983)). To prove constructive discharge, plaintiff must show that a reasonable person subjected to the working conditions experienced by plaintiff would have felt compelled to resign. *See Ternullo v. Reno,* 8 F.Supp.2d 186, 190 (N.D.N.Y.1998) (quoting *Pena,* 702 F.2d 322, 325). The employee's subjective assessment of working conditions as "intolerable" is insufficient, *see Neale v. Dillon,* 534 F.Supp. 1381, 1390 (E.D.N.Y.) *aff'd without op.,* 714 F.2d 116 (2d Cir.1982), and merely difficult or unpleasant working conditions do not rise to the level of constructive discharge. *See Martin v. Citibank, N.A.,* 762 F.2d 212, 221 (2d Cir.1985). Constructive discharge occurs only where an employee is subjected to an "unreasonable risk of physical harm, to significant verbal abuse, or is forced to accept significantly lower pay or inferior working conditions." *Ternullo,* 8 F.Supp.2d at 191. A change in job responsibilities with no decrease in pay or benefits does not reach the threshold required for a viable constructive discharge claim. *See Pena,* 702 F.2d at 326; *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360 (2d Cir.1993).

■ Plaintiff makes no showing that the work conditions at Pike Street were so "intolerable" that a reasonable person

would have felt compelled to resign.[5] Indeed, there is not even support for a claim that there was a change in his job responsibilities. Instead, plaintiff alleges only that, because of his physical ailments, he is unable and unwilling to return to work if he must continue to perform the functions of his job, which, as noted above, require heavy lifting on a daily basis. *See* Supplemental Declaration of Isaac Kaufman dated August 10, 2001, Exh. HH., Ongsiako Deposition taken July 21, 2001 at 5–8. Such allegations amount to nothing more than a claim by plaintiff that he was no longer able to perform his job. Accordingly, the Court rejects plaintiff's contention that defendants' constructively discharged him. For the foregoing reasons, plaintiff has failed to establish a *prima facie* case under the ADA and his claim of disability discrimination is therefore dismissed.

### B. Plaintiff's Racial Discrimination and Retaliation Claims

■ Plaintiff also claims that defendants discriminated against him because of his Filipino heritage and retaliated against him by transferring him back to Pike Street. With respect to his race discrimination claim, plaintiff seems to allege that defendants constructively discharged him because of his national origin—or that at minimum, he was treated worse than non-Filipino employees. To establish a *prima facie* case of national origin discrimination,[6] plaintiff "must ... demonstrat[e] membership in a protected class, qualification for the position, adverse employment action, and circumstances giving rise to an inference of discrimination." *Cruz v. Coach Stores,* 202 F.3d 560, 567 (2d Cir. 2000). Similarly, to make out a *prima facie* case of retaliation, plaintiff must show that (1) he was engaged in protected activity; (2) the employer was aware of the activity; (3) an adverse employment action was taken against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *accord Cifra v. General Electric Co.,* 252 F.3d 205, 216 (2d Cir.2001).

■ Plaintiff fails to make out a *prima facie* case on either claim. With respect to his discrimination claim, the parties do not dispute that plaintiff, because of his Filipino heritage, is a member of a protected class. Moreover, for the sake of argu-

---

**5.** To the extent plaintiff relies on his allegations that his co-workers directed racial epithets at him to support his constructive discharge claim, the Court finds these allegations legally insufficient. In short, all plaintiff contends is that his co-workers would often call him "hiyk" or "egg roll," but he has not come close to establishing that these remarks created an atmosphere so unbearable that a reasonable person would have resigned. Moreover, plaintiff alleges only that these statements were made before he transferred to Pike Street in 1998. Since his claim of constructive discharge is based on the transfer itself, the racial epithets he was subject to could not possibly form a basis for his constructive discharge claim.

**6.** Although it is unclear from his pleadings and motion papers, plaintiff seems to allege that he was subjected to a hostile work environment because of the ethnic slurs directed at him while he worked at the Construction Services yard. To the extent plaintiff makes such a claim, the Court finds that it lacks merit because there is no evidence from which a rational juror could infer that plaintiff's "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment." *Cruz,* 202 F.3d at 570 (internal quotations omitted). Indeed, to the contrary, plaintiff wanted to remain at the Construction Services yard—the only yard where he allegedly received such treatment—rather than work at Pike Street. This circumstance is sufficient to demonstrate the irrationality of his claims.

ment, the Court presumes: (1) that plaintiff was qualified to continue working as a construction laborer;[7] (2) that he was engaged in a protected activity—namely, requesting an accommodation and allegedly complaining about racially derogatory remarks by co-workers—; and (3) that the relevant decision-makers working for defendants were aware of this protected activity. However, even presuming all of that to be true, plaintiff has still failed to demonstrate that defendants took any adverse employment action against him. Thus plaintiff's discrimination and retaliation claims are dismissed.

### C. Plaintiff's State Law Claims

Finally, having denied plaintiff's federal causes of action, the Court declines to exercise its discretion to consider plaintiff's state law discrimination claims. *See Carnegie–Mellon v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *accord In re Porges,* 44 F.3d 159, 162 (2d Cir.1995) (court is "not required to dismiss [plaintiff's] state claims [but] dismissal of such claims is the general rule"). The Court therefore dismisses these claims without prejudice to being renewed in the appropriate state court venue.[8]

### CONCLUSION

For the foregoing reasons the Court grants defendants' motion for summary judgment and dismisses all of plaintiff's claims. The Clerk of the Court is hereby directed to close the above-captioned action.

**It is SO ORDERED.**

---

7. Of course, as stated above, it is clear that he was unable to perform the functions of a construction laborer and thus was seeking a permanent light duty assignment.

8. Assuming that plaintiff intended for his constructive discharge claim to stand alone as a separate state law cause of action, that claim too is dismissed without prejudice.